UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff<br><br>SHEANDA BRYANT, et al.,<br><br>                Plaintiffs-Intervenors<br><br>                v.<br><br>LAWRENCE COUNTY SCHOOL DISTRICT,<br><br>                Defendant | Civil Action No.<br>2:67-CV-2216-HSO-RHW |

**Memorandum in Support of Plaintiffs-Intervenors' Unopposed Motion
to Order the Parties to Participate in a Rule 26(f) Conference, and
to Continue the Date to Respond to the Defendant's Motion Until a Time Identified
in a Rule 16 Case Management Order**

       In light of unsuccessful efforts to obtain from Lawrence County School District ("LCSD") by informal means information necessary to respond to its Motion, Plaintiffs-Intervenors ask this Court to order the parties to participate in a Rule 26(f) Conference; to submit a proposed case management order pursuant to Local Rules 16(c) and 26(f)(7); and to participate in a Case Management Conference with Magistrate Judge Walker.

       In addition, Plaintiffs-Intervenors ask this Court to continue the date for their response to LCSD's motion to modify the desegregation decree (ECF 23) until after discovery is completed, the precise due date to be established by this Court in the Case Management Order issued pursuant to Rule 16(b) and Local Rule 16(f).

Defendant LCSD and Plaintiff United States of America both consent to the Plaintiffs-Intervenors' Motion. Nonetheless, Plaintiffs-Intervenors offer the following argument in support of their unopposed Motion.

## ARGUMENT

Based on a divided, racially-polarized 3 to 2 vote by its board, LCSD seeks to alter the status quo established by the current desegregation decree by constructing new buildings at a new location; transferring all the students, teachers, and other employees of an historically-black middle school to those new buildings; and abandoning and selling this historic middle school – disproportionately burdening African Americans and those with ties to the school without serving desegregation or improving educational opportunities relative to other reasonable proposals. LCSD acknowledges that in order to do this, this Court must modify the longstanding desegregation decree in this case. *See generally* LCSD Motion to Modify Desegregation Plan, ECF No. 23.

The ultimate question before this Court will be whether granting LCSD's Rule 60(b)(5) Motion to modify the desegregation decree is "suitably tailored" in light of the Fifth Circuit's general case law regarding a school district's continuing affirmative duty to desegregate its system,[1] as well as the prior Fifth Circuit decisions in this litigation.[2]

---

[1] *See Monteilh v. St. Landry Par. Sch. Bd.*, 848 F.2d 625, 631 (5th Cir. 1988) (schools "have 'an affirmative duty, overriding all other considerations with respect to the locating of new schools, except where inconsistent with proper operation of the school system as a whole to *seek* means to eradicate the vestiges of the dual system'" (citations and some internal quotations omitted)).

[2] *See United States v. Lawrence Cnty. Sch. Dist.*, 799 F.2d 1031, 1041, 1046 (5th Cir. 1986) (LCSD's "failure to eliminate racially identifiable schools, a more than vestigial hallmark of segregation," violated LCSD's "affirmative duty to desegregate") (second phrase quoting *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 32 (1971)); *see also id.* at 1051 (reprinting 1985 unpublished Fifth Circuit opinion regarding LCSD stating that "the district court should have judged the building program by requiring it, and the Board's plan, *to promote integration* rather than to avoid reinstating segregation").

The immediate question, however, is whether Plaintiffs-Intervenors should be permitted to obtain discovery from LCSD about its proposal. First, Plaintiffs-Intervenors show that discovery is a common part of litigation when courts are asked to resolve a motion to modify under Rule 60(b)(5). Next, Plaintiffs-Intervenors demonstrate that discovery is warranted here to allow Plaintiffs-Intervenors to meaningfully respond to LCSD's motion and to propose alternative, "suitably tailored" modifications to address the current conditions in LCSD. Finally, the scope and timing of discovery and further proceedings should be brought to the Court after the conferral and scheduling process identified in Rules 16 and 26.

### A. Courts Routinely Order Discovery Before Ruling On A Rule 60(b)(5) Motion To Modify Or Terminate A Desegregation Decree

Federal Rule of Civil Procedure 60(b)(5) authorizes a court to relieve a party from a final judgment when "applying it prospectively is no longer equitable." The party seeking to modify the judgment bears the burden of establishing that a "significant change in factual conditions make a consent judgment unworkable, make compliance substantially more onerous, or make enforcement detrimental to the public interest." *United States v. Texas*, 601 F.3d 354, 373 (5th Cir. 2010) (citing *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384-85 (1992)). If the moving party meets this initial burden, the court "must consider whether 'the proposed modification is suitably tailored to the changed circumstance.'" *Frazar v. Ladd*, 457 F.3d 432, 436 (5th Cir. 2006) (quoting *Rufo*, 505 U.S. at 383).

LCSD relies exclusively on a changed factual condition – the current disrepair of Rod Paige Middle School ("RPMS") – as the basis for modifying the desegregation decree. In its effort to show that the particular modification it seeks is suitably tailored to this circumstance (and that alternatives preferred by the Plaintiffs-Intervenors are not), LCSD relies extensively on

assertions about the projected costs of various construction options, LCSD's financial capacity, and the (lack of) effects on consolidation on the students and faculty of RPMS.

LCSD bears the burden of persuasion, under Rule 60(b)(5), to show both a significant change in circumstances and that its proposed modification is "suitably tailored." *See Frew v. Janek*, 820 F.3d 715, 720 (5th Cir. 2016) (party seeking modification "must meet its burden at both steps of this test"); *see also Anderson ex rel. Anderson v. Canton Mun. Separate Sch. Dist.*, 232 F.3d 450, 453 (5th Cir. 2000) ("the School Board . . . must demonstrate" that proposed construction subject to a desegregation order will not "tend to promote" any "resegregation of a former dual system").

This burden cannot be sustained by allegations alone. For example, in *League of United Latin American Citizens, Dist. 19 v. City of Boerne*, 659 F.3d 421, 440 (5th Cir. 2011), the Fifth Circuit vacated a court's modification of a consent decree because it was entered without evidentiary support and remanded for the district court "to develop a sufficient record in order to decide whether, consistent with this opinion, modification of the consent decree is appropriate."

In this case, LCSD is not relying on allegations alone. It submitted numerous exhibits with its Motion, but many are either conclusory or not self-explanatory. Some assertions made in the supporting memorandum find no support in the exhibits at all. This mirrors the situation faced by the Fifth Circuit in the *LULAC* appeal after remand. The Fifth Circuit again vacated the court's modification of the decree because it was based "primarily upon a single affidavit and an otherwise underdeveloped record," which included "minutes from various City Council meetings in which the modification was discussed, [and] correspondence with the DOJ regarding preclearance of the single-member district system." *League of United Latin American Citizens, Dist. 19 v. City of Boerne*, 675 F.3d 433, 438 & n.4 (5th Cir. 2012). The Fifth Circuit criticized

the district court because it "did not, for example, permit the parties to conduct discovery, or hold an evidentiary hearing to receive competing expert and lay testimony, or even offer [the party opposing the modification] a substantial opportunity to rebut the evidence that the [movants] presented" before modifying the decree. *Id.* at 438.

It is thus not surprising that other courts in this Circuit have routinely permitted discovery before ruling on a school district's motion to modify or terminate a desegregation decree. For example, in *McNeal v. Tate County School District*, No. 2:70-cv-29-DMB, 2016 WL 6651328 (N.D. Miss. Nov. 10, 2016), the district court authorized discovery after the school district filed a motion to modify a 1970 desegregation decree. The court recognized that "the widest latitude conceivable in discovery has been extended to the U.S. Department of Justice, Civil Rights and related agencies, *and parties with compatible interests*, seeking to eradicate the evils of school segregation and racial discrimination." *Id.* at *5 (quoting *United States ex rel. Mitchell v. Choctaw Cnty. Bd. of Educ.*, 310 F. Supp. 804, 809 (S.D. Ala. 1969) (emphasis added)). "Accordingly," the court held, "in a desegregation case, discovery should be permitted when it is relevant to the determination of the merits of a pending motion, or would be otherwise discoverable under Rule 26 of the Federal Rules of Civil Procedure." *Id. See also Banks. v. St. James Par. Sch. Bd.*, No. 65-16173, 2021 WL 2070132, at *6 (E.D. La. May 14, 2021) (granting plaintiffs' request for discovery after "considering the broader relevance standard in discovery and the issues implicated by the School Board's motion for declaration of unitary status"); *Cowan v. Bolivar Cnty. Bd. of Educ.*, No. 2:65-cv-31-DMB, 2017 WL 98841, at *1 (N.D. Miss. Mar. 13, 2017) ("The United States and the private plaintiffs opposed the first proposed modification, and recently concluded a period of discovery related to the merits of the second

proposal."). As another district court reasoned in a Rule 60(b)(5) case outside the desegregation context:

> Defendants cannot meet their burden, and plaintiffs (and this Court) cannot test defendants' allegations, absent facts. And, as the Supreme Court has noted, "[d]iscovery is useful in determining what the facts are."

*Nat'l L. Ctr. on Homelessness & Poverty v. U.S. Dep't of Veterans Affs.,* 842 F. Supp. 2d 127, 131 (D.D.C. 2012) (quoting *NLRB v. Deena Artware, Inc.*, 361 U.S. 398, 404 (1960)) (footnote omitted).

### B. Plaintiffs-Intervenors Need Information In LCSD's Possession In Order To Assess Whether The Modification Is Suitably Tailored To The Conditions At LCSD

Considered in isolation, LCSD's proposal could seem unobjectionable. According to LCSD:

- RPMS is in a state of significant disrepair.

- LCSD can afford to construct a new building alongside Monticello Elementary School ("MES"), which is a couple of miles away from RPMS' current location.

- That new building will be able to accommodate the entire student body of RPMS (with additional space to serve 100 more students).

- The projected racial profile of the student population of the new consolidated school would not be substantially different than the profile of either existing school separately.

Thus, LCSD argues, the motion to modify the desegregation decree should be approved because it cannot continue educating RPMS students in the existing building and the consolidation does not further racial segregation.

But a recommendation to consolidate or construct new facilities cannot be considered in isolation. New buildings implicate student assignment plans, transportation routes, and attendance zones that last for decades, perpetuating or furthering racial enrollment patterns for generations to come. *See Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 20-21

(1971). Nor can consolidation and construction be considered apart from the history of the school district. And LCSD's history shows the continuing insidious effects of earlier school location decisions on racial segregation.

      1. *History of LCSD's Failed Desegregation Efforts.* In 1967 – thirteen years after the Supreme Court's decision in *Brown*, and three years after Congress' enactment of the Civil Rights Act – LCSD had done nothing to desegregate its school system. "The county then had seven schools, five for white students, with white faculty, and two for black students, with black faculty." *United States v. Lawrence Cnty. Sch. Dist.*, 799 F.2d 1031, 1034 (5th Cir. 1986). Two years later, still no white students attended either "traditionally Negro school;" only 32 Black students (out of 1263) were expected to enroll in the traditionally white schools. *See United States v. Hinds County Sch. Bd.*, 417 F.2d 852, 855 & n.1 (5th Cir. 1969). It was only in 1970, after the federal courts acted, that any real progress toward desegregation was made.

      But such progress was not steady. In 1986, the Fifth Circuit held that LCSD was still not meeting its affirmative constitutional obligation to address the vestiges of its segregated education system. The Fifth Circuit found that four of the remaining six schools in LCSD were still "racially identifiable" vestiges of the district's prior segregation. 799 F.2d at 1040. LCSD's school population at the time was 56% white and 44% black. The Court held that RPMS, previously known as McCollough Junior High, "is perceived as being, and is, a predominantly black school" because it was one "of the two schools that black students were required to attend before 1970" and 52% of the students were black (6% greater than the total student population). *Id*. The Fifth Circuit also found Topeka Tilton Attendance Center to be "clearly racially identifiable," based on the fact that "historically, the school has been considered white," 90% of

the student body was white, and 87% of its faculty was white (figures largely unchanged to this day, *see* note 4, *infra*). *Id.* at 1039.

While changes were made after 1986 (particularly the consolidation of all high school students in a single school), LCSD has not changed much in terms of racial desegregation in the lower grades. In the most recent school year before the pandemic, LCSD's school population was 57% white, 40% Black, 2.5% Hispanic, and 0.3% Asian American/Pacific Islander.[3] LCSD operates five schools, including three that serve grades 5-8.

- RPMS, a grade 5-8 school (363 students), where 52% of the students are black (12% greater than the total student population), is located in Monticello, the center of the county.

- New Hebron, a K-8 school (336 students), where 53.5% of the students are black (13.5% greater than the total student population), is located in the northwest portion of the county.

- And Topeka Tilton, a K-8 school (381 students), where 87.5 % of the students are white (*30.5% greater than the total student population*), is located in the southwest portion of the county.

Even if the significant differences in racial enrollment at the schools are due in part to residential patterns in the county, those patterns themselves are not a neutral factor. The Fifth Circuit held they are attributable to LCSD. "The very demographic factors that separate residential areas by race in Lawrence County are in part a vestige of past segregative practices by the Board." 799 F.2d at 1043-44. Further, the Fifth Circuit found, the geography of the county does not limit access for residents between Monticello and the other parts of the county. *Id.* at 1047-48 (finding "Monticello is one place in the county that is accessible to all areas," that

---

[3] All the numbers in this paragraph are drawn from the report LCSD filed with this Court about the 2019-20 school year. ECF 18 at 2-3. The pandemic resulted in significant, albeit likely temporary, decreases in enrollment across the district in the 2020-21 and 2021-22 school years. *See id*. at 2 (total enrollment 2028 in September 2019); ECF 22-1 at 2 (total enrollment 1857 in September 2020); ECF 33-1 at 2 (total enrollment 1770 in September 2021).

students in the Topeka Tilton area "may travel a paved highway eleven miles [to Monticello], a trip that takes sixteen minutes," and that the "Pearl River does not limit access to Monticello from any part of the county," reversing the district court's contrary finding as clear error).

Although a district may not be obligated to maximize the level of integration within its schools, it must still select "only sites that serve desegregation and do not foster resegregation." *Anderson*, 232 F.3d at 455; *see also Cowan v. Bolivar Cnty. Bd. of Educ.*, No. 2:65-CV-00031-DMB, 2016 WL 5462820, at *2 (N.D. Miss. Sept. 29, 2016) ("While this standard of review for modifications places great trust in a district, a court must still 'examine each of the proposed amendments in detail, keeping in mind the ultimate goal of achieving a unitary school system which offers quality education to all students.'") (internal citation omitted). Topeka Tilton was specifically identified as a racially identifiable vestige of segregation by the Fifth Circuit in 1986 and remains so today.[4] Planning to build new school facilities without addressing how to desegregate a school that has served for over fifty years as a white enclave does not appear to meet the requirement that site selection must serve desegregation.

2. *Alternatives that would use the need for construction as an opportunity to further desegregate LCSD.* In 1986, the Fifth Circuit held that Plaintiffs-Intervenors' proposal to consolidate all the middle school students in a single school (and all elementary school students in another single school) was not required because it "would require the construction of additional facilities and the abandonment or partial abandonment of existing schools." 799 F.2d

---

[4] As noted above, in 1986, the Fifth Circuit held that Topeka Tilton was a racially identifiable vestige of prior segregation because "ninety percent of the student body at Topeka Tilton is white, 87% of its faculty is white, historically the school has been considered white, and it is located in an area in which the population is predominantly white." 799 F.2d at 1039. Very little has changed. In the 2019-20 school year, 87.5% of the student body at Topeka Tilton was white and 92% of its faculty was white. ECF No. 18 at 2-3.

at 1048. But now, that is exactly the recommendation proposed by LCSD – it is abandoning its only school that serves only middle school students and constructing additional facilities (with some excess but arbitrarily limited capacity) for those students. And so now, LCSD must ensure that its plan will serve desegregation and not further segregation and that it has meaningfully evaluated whether all middle school students (or at least those currently educated at Topeka Tilton) should be learning together in a single racially-integrated school.

One possibility to serve desegregation is that LCSD could construct a new large-enough middle school facility at the current location of RPMS or at some other location closer to the southwestern part of the county to enroll the 180 middle schoolers (grades 5-8) currently served at Topeka Tilton. ECF No. 18 at 15. Such a stand-alone facility would enroll 37% black students and 60% white students, within 3% of the districtwide population. Plaintiffs-Intervenors submitted a plan that would allow LCSD to build a facility with more classroom space for a lower price per square foot at the current site of RPMS, urging that the new building could "be used in the future to further integrate the Lawrence County School System" and "eliminate the racial disparities that currently exist in the outlying New Hebron and Topeka Schools" by bringing those students "to the center of the county." ECF No. 26-1 (Ex. I) at 1.

Another possibility to serve desegregation, depending on how the facts develop, is that LCSD could establish a school with sufficient capacity to accommodate more of the district's middle school students in the new facility it proposes alongside MES if it makes the facility large enough. LCSD's current plan would accommodate only "approximately 100 students more than the current overall student population of RPMS and MES" (LCSD Mem. in Supp., ECF No. 24 at 16), an arbitrary number that serves no clear purpose as there are 180 middle schoolers currently served at Topeka Tilton. ECF No. 18 at 15. If LCSD established a school with

sufficient capacity for those middle school students, the combined population of MES, RPMS, and the middle schoolers of Topeka Tilton would be 42% black students and 54% white students, within 3% of the districtwide population. Either way, LCSD ignored an opportunity to address its facility concerns in a way that would reduce the number of students attending racially identifiable schools and increase racial integration.

To justify its decision to build a smaller facility alongside the MES space, LCSD relies heavily on the estimated cost of construction and its ability to pay. It asserted that "the only options that are attainable without a countywide [property tax] referendum . . . are any projects up to approximately $5 million dollars." ECF No. 26 (Ex. H) at 7. But the exhibits do not appear to explain where that number comes from, or why LCSD is convinced that a property tax referendum would fail.

In fact, LCSD itself says that "there is a possibility of the availability of state and/or federal funding sources to further assist with the financial requirements of the project." LCSD Mem. in Supp., ECF No. 24 at 16. Indeed, Mississippi school districts have several different ways to fund construction: "Mississippi school districts may finance capital improvements for a period of up to 20 years through a general obligation lease" and may "borrow from its Sixteenth Section principal trust fund to pay for capital improvements." *Cowan v. Bolivar Cnty. Bd. of Educ.*, 186 F. Supp. 3d 564, 587-88 (N.D. Miss. 2016) (quoting expert report submitted by school district). It's not clear which of these methods, other than raising property taxes, have been explored.

Related to the questions about cost of construction are concerns that Topeka Tilton and New Hebron – the other schools serving grades 5-8 – themselves require capital improvements now or in the very near future. If LCSD could avoid or reduce the cost of improving those

Page 11

schools by moving some of the students to a new facility, the district would realize savings that would make Plaintiffs-Intervenors' proposals even more clearly feasible, and would render obsolete LCSD's excuse that its proposal is the only one it can afford.. (This fact, at least, should be easy to determine. LCSD says that the school board authorized it in March 2020 to "have a needs assessment of each [school] site." ECF No. 26 (Ex. H) at 2.)

3. *Additional concerns about the effects of the proposed consolidation plan on the students at RPMS, a majority black school.* Finally, even looking just at the effect of the consolidation plan proposed by LCSD on the students of RPMS, there are outstanding factual questions about whether the proposed shift to these new facilities at MES would adversely impact the students' educational opportunities.

For example, there will not be a gym for the RPMS students at the new facility. In fact, they will have to travel to the separate site of the Lawrence County High School for their "sports-related needs." LCSD Mem. in Supp., ECF No. 24 at 15. Nothing in LCSD's exhibits addresses how that is to be accomplished, and how it will affect the ability of RPMS students to participate in gym and extracurriculars, including athletics, cheer, and band, and whether they will have to sacrifice academic time in order to participate in gym and extracurriculars due to the absence of on-site facilities.

Similarly, LCSD claims that it "affirmatively found" that its consolidation proposal "does not place any additional inequitable transportation burdens on black students (or any other minorities or anyone, period)." *Id.* at 18. This suggests that the current system may already impose "inequitable" transportation burdens on black students, one that may not be exacerbated by LCSD's proposed consolidation but will certainly not be mitigated by it. This is inconsistent with the district's affirmative obligations to avoid "an inequitable transportation burden on black

students." *Anderson*, 232 F.3d at 454. Further, the only potentially relevant exhibits it included with its Motion are maps showing where students live. ECF Nos. 27-2, 30, 30-1 (Exs. O, P, Q). These exhibits do not identify transportation routes or times, and do not show how those distances or times would change based on the proposed new location of the school.

Plaintiffs-Intervenors, and this Court, need more information to assess LCSD's proposal.[5]

### C. A Rule 26(f) Conference And The Rule 16 Case Management Process Will Allow The Parties To Properly Frame Any Disputes About The Scope and Timing Of Any Discovery And Future Proceedings.

This is not a new case. But LCSD's Motion is the first substantive activity on the docket in more than 30 years. The processes identified in Federal Rules of Civil Procedure 16 and 26 are an appropriate way for the parties to try and reach agreement about the scope and timing of any discovery and briefing, and then present their proposal and any disputes to the Court for resolution.

Plaintiffs-Intervenors have tried less formal means of obtaining information from LCSD. After LCSD filed its Motion, Plaintiffs-Intervenors requested information from it about various assertions made in the motion, memorandum, and attached exhibits. Counsel for LCSD declined to provide any information, explaining that LCSD would not respond to requests "until Discovery has begun and such requests are conducted within the bounds of said Discovery." Plaintiffs-Intervenors Ex. A at 1. When counsel for Plaintiffs-Intervenors again expressed the

---

[5] The Fifth Circuit has also held that whether "a school board has consistently complied with a court decree in good faith" is "pertinent" to and "should inform" whether "a particular school board action, in a district that has long lived with a desegregation decree but failed to seek dismissal of the case, sufficiently comports with the goals of the [desegregation] decree." *Hull v. Quitman Cnty. Bd. of Educ.*, 1 F.3d 1450, 1454 (5th Cir. 1993). That holding would appear to require some inquiry into LCSD's compliance with the entire desegregation decree. Claims of good faith are made in one of LCSD's exhibits (ECF No. 26 (Ex. H) at 13-14), but only as to its intentions in proposing the plan, not as to its consistent compliance with the desegregation decree. LCSD also didn't raise good faith in its Motion or supporting memorandum or cite the *Hull* decision.

Page 13

desire to engage in informal requests in order to conserve the resources of both parties, and asked if there were particular requests that LCSD thought were not germane or that LCSD wanted Plaintiffs-Intervenors to narrow, counsel for LCSD stated that "due to the consolidation issue now being an open federal case, I feel ethically bound to proceed in accordance with the rules, et al., that normally govern such proceedings versus spending time on matters (such as 'RFIs') that are outside the normal procedure." *Id.* at 1.

Plaintiffs-Intervenors acknowledge that counsel for LCSD first notified their counsel in general terms of LCSD's concerns about the RPMS facilities in 2020. However, until recently when LCSD settled on a plan to accommodate its facility and student needs, Plaintiffs-Intervenors were unable to identify the specific facts and information necessary to determine whether the proposed plan is "suitably tailored." Instead of making requests for information from counsel, Plaintiffs-Intervenors sought to engage in discussions with LCSD's school board. As LCSD acknowledges (LCSD Mem. in Support, ECF No. 24 at 8), this resulted in a preliminary exchange in Executive Session with the Board, after which Plaintiff-Intervenors were eager and excited to work with LCSD on a plan. Then, abruptly, and without further engaging with Plaintiff-Intervenors, the Board immediately voted 3 to 2 to authorize the filing of the Motion to Modify. The need for discovery has now fully crystalized.

**CONCLUSION**

For the foregoing reasons, Plaintiffs-Intervenors pray that this Court grant their Motion and order the parties to participate in a Rule 26(f) Conference; to submit a proposed case management order pursuant to Local Rules 16(c) and 26(f)(7); to participate in a Case Management Conference with Magistrate Judge Walker at the Court's convenience; and to continue the date for Plaintiffs-Intervenors' response to LCSD's motion until a date to be established in the Case Management Order issued pursuant to Rule 16(b) and Local Rule 16(f).

Respectfully submitted,

/s/ Shakti Belway
Shakti Belway, Esq.
MS Bar No. 109025
P.O. Box 2040
Santa Barbara, CA 93120
Email: shakti.belway@gmail.com
Counsel for Plaintiffs-Intervenors

**CERTIFICATE OF SERVICE**

I, SHAKTI BELWAY, do hereby certify that on November 12, 2021, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will send notifications of such filing to counsel for plaintiff United States of America and defendant Lawrence County School District.

/s/ Shakti Belway
Shakti Belway
Counsel for Plaintiffs-Intervenors